UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DR. MATTHEW C. MOELLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:16-cv-00446-JMS-MPB |
| | ) | |
| THE BOARD OF TRUSTEES OF INDIANA | ) | |
| UNIVERSITY d/b/a INDIANA UNIVERSITY | ) | |
| SCHOOL OF DENTISTRY, MICHAEL MCROBBIE, | ) | |
| NASSER H. PAYDAR, JOHN N. WILLIAMS, KIM | ) | |
| D. KIRKLAND, and CHARLES BANTZ, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff Dr. Matthew Moeller worked at Indiana University in the School of Dentistry (the

"University") as a Clinical Assistant Professor of Operative Dentistry – a non-tenure track

position. In October 2014, the University became aware of allegations of sexual harassment made

by students against Dr. Moeller. University representatives interviewed numerous students and

informed Dr. Moeller that there were complaints that he had patted, rubbed, and massaged the

backs of female students without their permission, and touched and rubbed the upper leg of a

female student. Dr. Moeller admitted these allegations, but disputed their context and significance.

After an investigation, which afforded Dr. Moeller the opportunity to present his version of events,

the University terminated Dr. Moeller's employment. Dr. Moeller filed complaints and appeals

with various University entities, one of which recommended that the University should provide

Dr. Moeller with more information regarding the allegations, interview him again, and provide

him with the reasons the University concluded that he should be terminated. The University

adopted these recommendations and offered Dr. Moeller the additional information and another

interview on the condition that he waive his right to appeal the decision, but Dr. Moeller declined the offer. He then initiated this litigation, asserting, among other claims, violation of his right to procedural due process.

Defendants have filed a Motion for Summary Judgment, [Filing No. 68], and Dr. Moeller has moved to dismiss two of his claims, [Filing No. 80].[1] Both motions are now ripe for the Court's decision.

# I.
## STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed below in connection with Defendants' Motion for Summary Judgment. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Dr. Moeller's Initial Employment With the University

The University hired Dr. Moeller in 1985 as a part-time clinical instructor in the School of Dentistry. [Filing No. 68-1 at 3.] Also in 1985, Dr. Moeller opened a private practice where he worked approximately 15 to 18 hours per week. [Filing No. 68-1 at 3.] Dr. Moeller maintained his private practice for approximately thirty years, until October of 2016. [Filing No. 68-1 at 3.]

In July of 1996, the University offered Dr. Moeller a non-tenure track position as Clinical Assistant Professor of Operative Dentistry in the Department of Restorative Dentistry. [Filing No.

---

[1] Also pending and ripe for the Court's decision is Defendants' Motion for Leave to File Surreply in Opposition to Plaintiff's Motion to Dismiss Counts Two and Five, [Filing No. 84], which the Court addresses below.

68-1 at 4; Filing No. 68-3 at 3.]  The University describes the position as "primarily participat[ing] in preclinical and clinical instruction for undergraduate dental students."  [Filing No. 68-3 at 3.] The appointment was for two years, with "eligibility for annual reappointment."  [Filing No. 68-3 at 3.]  The University also offered Dr. Moeller a position as Clinic Director in the Comprehensive Care Program, a non-tenure track position that was a one-year appointment with a chance for reappointment to a three-year term.  [Filing No. 68-3 at 1.]  As Clinic Director, Dr. Moeller would "manage the succession of charts from graduating students to new third-year students and distribute them fairly and then replenish them as [he] was able.  And [he] would counsel them in difficulties that they would have…."  [Filing No. 68-1 at 5.]  Dr. Moeller believed that he "played a more important role than anyone on faculty or staff" in the students' ability to successfully complete dental school.  [Filing No. 68-1 at 6.]  In May 2014, the University notified Dr. Moeller that his appointment as Clinical Assistant Professor had been extended through the 2021-22 academic year.  [Filing No. 68-4.]

### B.  University Policies and the University Handbook

The University instituted a policy entitled "Permanent Separations for Academic Appointees," which stated in relevant part:

**Discharge for Cause**

**Dismissal From The Faculty Or Libraries**

Dismissal shall mean the involuntary termination of a tenured faculty member's or librarian's appointment prior to retirement or resignation, or the termination of the appointment of a non tenured faculty member or librarian prior to the expiration of the term of appointment. *Dismissal* is thus to be distinguished from the *non-reappointment* of a probationary faculty member. Dismissal shall occur only for reason of (a) incompetence, (b) serious personal or professional misconduct, or (c) extraordinary financial exigencies of the University. No faculty member or librarian shall be dismissed unless reasonable efforts have been made in private conferences between the faculty member and the appropriate administrative officers to resolve questions of fitness or of the specified financial exigency. If no resolution is attained, the faculty member or librarian to be dismissed shall be notified of dismissal in writing by the Vice President or Provost or President one year before the date the dismissal is to become effective, except that a faculty member or librarian deemed guilty of serious personal misconduct may be dismissed upon shorter notice, but not on less than ten days' notice. Upon receipt of the dismissal notification, a faculty member or librarian must be accorded the opportunity for a hearing. A statement with reasonable particularity of the grounds proposed for the dismissal shall be available in accordance with the provisions of the Faculty Constitution. A faculty member or librarian shall be suspended during the pendency of dismissal proceedings only if immediate harm to himself, herself, or others is threatened by continuance. Any such suspension shall be with pay.

[Filing No. 68-5 at 2.]

The University also instituted a "Code of Academic Ethics" policy, which states in relevant part:

*Relations with Students.* With regard to relations with students, the term "faculty" or "faculty member" means all those who teach and/or do research at the University including (but not limited to) tenured and tenure-track faculty, librarians, holders of research, lecturer, or clinical appointments, graduate students with teaching responsibilities, visiting and part-time faculty, and other instructional personnel including coaches, advisors, and counselors.

The University's educational mission is promoted by professionalism in faculty/student relationships. Professionalism is fostered by an atmosphere of mutual trust and respect. Actions of faculty members and students that harm this atmosphere undermine professionalism and hinder fulfillment of the University's educational mission. Trust and respect are diminished when those in positions of authority abuse or appear to abuse their power. Those who abuse their power in such a context violate their duty to the University community.

Faculty members exercise power over students, whether in giving them praise or criticism, evaluating them, making recommendations for their further studies or their future employment, or conferring any other benefits on them. All amorous or sexual relationships between faculty members and students are unacceptable when the faculty member has any professional responsibility for the student. Such situations greatly increase the chances that the faculty member will abuse his or her power and sexually exploit the student. Voluntary consent by the student in such a relationship is suspect, given the fundamental asymmetric nature of the relationship. Moreover, other students and faculty may be affected by such unprofessional behavior because it places the faculty member in a position to favor or advance one

student's interest at the expense of others and implicitly makes obtaining benefits contingent on amorous or sexual favors. Therefore, the University will view it as a violation of this Code of Academic Ethics if faculty members engage in amorous or sexual relations with students for whom they have professional responsibility, as defined in number 1 or 2 below, even when both parties have consented or appear to have consented to the relationship. Such professional responsibility encompasses both instructional and non-instructional contexts.

1. Relationships in the Instructional Context. A faculty member shall not have an amorous or sexual relationship, consensual or otherwise, with a student who is enrolled in a course being taught by the faculty member or whose performance is being supervised or evaluated by the faculty member.

2. Relationships outside the Instructional Context. A faculty member should be careful to distance himself or herself from any decisions that may reward or penalize a student with whom he or she has or has had an amorous or sexual relationship, even outside the instructional context, especially when the faculty member and student are in the same academic unit or in units that are allied academically.

[Filing No. 68-7 at 2-3.]

The University Handbook states:

Statements and policies in this *Handbook* do not create a contract and do not create any legal rights. In the event of differences between this document and the original documents cited therein, the wording in the original documents or master contracts shall obtain.

[Filing No. 68-6.]

Finally, the University's Code of Academic Ethics states:

4

B. **ENFORCEMENT PROCEDURES**

    a. **Initiation of Complaints**
        Any concerned person may initiate complaints about alleged violations of the Code of Academic Ethics. Such complaints should be brought to the attention of an appropriate chairperson or dean, or to the appropriate Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs or his or her deputy; the Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs shall provide for confidential representations regarding such violations. Charges of discriminatory practice may be referred also to the appropriate Affirmative Action Officer.

    b. **Administrative Action on Violations of Academic Ethics**
        The line of administrative action in cases of alleged violation of academic ethics shall be the chairperson; the academic dean; the appropriate Vice Provost for Faculty and Academic Affairs/Vice Chancellor for Academic Affairs; the appropriate Chancellor/Provost; a Vice President, where appropriate; and the President. Subject to the substantive standards of University tenure policy and the procedural safeguards of the faculty institutions, sanctions appropriate to the offense should be applied by the academic administrators. Possible sanctions include the following: reprimand, consideration in establishing annual salary, consideration in promotion decisions, consideration in tenure decisions, retention of salary, termination of employment, and immediate dismissal.

    c. **Review of Administrative Action**
        Academic appointees affected by administrative action taken against them on grounds of violation of the Code of Ethics, whether or not the action resulted from proceedings provided in this Code, shall have such rights as are provided by the rules governing appeals to the Faculty Board of Review (or to the Associate Instructor Board of Review) of the appropriate campus. Appointees also have the rights of hearing and appeal provided by any other procedure of the University for the review of administrative action.

[Filing No. 68-7 at 7-8.]

## C. The Allegations Against Dr. Moeller

In October 2014, Dr. Melanie Peterson, the Associate Dean for Admissions and Student Affairs at the University, notified Dr. Kim Kirkland, the Director of the University's Office of Equal Opportunity ("OEO"), that she had learned that there was a complaint of sexual harassment against a faculty member. [Filing No. 68-8 at 2-5.] Dr. Kirkland asked Ginger Arvin, a senior investigator at the OEO, to follow up with Dr. Peterson regarding the allegation, and Ms. Arvin interviewed Dr. Peterson shortly thereafter. [Filing No. 68-8 at 5; Filing No. 68-8 at 10; Filing No. 68-9 at 2; Filing No. 68-9 at 6; Filing No. 68-10.] Dr. Peterson advised Ms. Arvin that a dental student in Clinic B mentioned to her during a meeting that female students in Clinic B felt uncomfortable because Dr. Moeller would touch them inappropriately. [Filing No. 68-8 at 3; Filing No. 68-10 at 1.] Dr. Peterson also advised that a female student in Clinic B told her that Dr.

Moeller had put his arm around her, that she did not feel comfortable, and that Dr. Moeller put his hand on the thigh of another female student in Clinic B during a class session. [Filing No. 68-8 at 3-4.] After her interview, Dr. Peterson sent Ms. Arvin an email which stated:

> I just spoke with [the female student in Clinic B] and she will be expecting you to contact her. She indicated that "everyone in Clinic B is aware of the situation." She indicated that the situation with the student who will hopefully stop by later this afternoon "crossed the line." She suggested that it might be helpful to have a meeting with the entire Clinic group of students since "everybody knows." There are allegations that this has happened before and was never addressed properly. I have no idea if this is true. Dr. George Willis is the Clinic Dean and if a student was moved to another group I would think he would be aware. Understandably there is concern about retaliation and "not graduating" on time because of this.

[Filing No. 68-8 at 5; Filing No. 68-11.][2]

Ms. Arvin interviewed the female student on October 15, 2014, and the student discussed three incidents involving Dr. Moeller. [Filing No. 68-9 at 2; Filing No. 68-12.] First, the student advised that she took a concern regarding a radiograph to Dr. Moeller at the end of July 2014, and that during their discussion Dr. Moeller patted her back. [Filing No. 68-9 at 3; Filing No. 68-12 at 1; Filing No. 68-13 at 2-3.] The student stated that, at the time, she did not think anything about him touching her back, and understood that the pat was a "pat of encouragement." [Filing No. 68-9 at 3; Filing No. 68-12 at 1; Filing No. 68-13 at 3.]

---

[2] Defendants state in their brief that "Dr. Peterson also informed Ms. Arvin that [the female student in Clinic B who complained that Dr. Moeller had put his hand on her thigh] 'has had a couple of unpleasant encounters with Dr. Moeller.' [Filing No. 68-11.] Dr. Peterson stated that she was 'concerned that any students are put in the position of feeling uncomfortable,' and that she was 'getting the idea that this behavior has been long-standing.' [Id.]." However, the email filed at Filing No. 68-11 does not contain this information or the quoted language. The Court is under no obligation to "scour every inch of the record," Johnson v. Cambridge Indus., 325 F.3d 892, 898 (7th Cir. 2003), although it did attempt to locate the quoted language in other exhibits, to no avail. Accordingly, the Court will not consider this information.

Second, the student advised that during a Group Learning Activity ("GLA") with another clinic director on September 4, 2014, she was sitting in a chair around a table when Dr. Moeller came over to her, bent down to greet her, and then rubbed the top of her right thigh for a couple of seconds. [Filing No. 68-9 at 3-4; Filing No. 68-12 at 2.] The student, who is not American born, stated that she froze and wondered whether Dr. Moeller's conduct was acceptable in American culture. [Filing No. 68-12 at 2; Filing No. 68-13 at 5.] The student thought it "[c]ould be [Dr. Moeller] was trying to hit on me," and that it was "awkward behavior" and "completely inappropriate behavior." [Filing No. 68-13 at 9-10.] Dr. Moeller contends that he touched the student on her left knee, that the student then "suddenly switched chairs with a male classmate," that she then plugged her laptop in and he "wondered if that was the reason she suddenly moved," that he later apologized to her for touching her leg, and that she "meekly said words expressing, 'It's ok, it's nothing.'" [Filing No. 79-47 at 1.]

Third, the student told Ms. Arvin that at a GLA the following week, Dr. Moeller dragged a chair over to her to sit by her and then gave her a back massage without her permission. [Filing No. 68-13 at 5-6.] A male student immediately saw how uncomfortable the female student was, and offered to trade seats with her. [Filing No. 68-13 at 5-6.] The student advised Ms. Arvin that as a result of these three incidents, she tried to stay away from Dr. Moeller because she did not feel secure or comfortable and worried that her career might be at risk if she made a complaint against him. [Filing No. 68-12 at 3-5; Filing No. 68-13 at 6-7; Filing No. 68-13 at 11.] The student stated that students are intimidated by Dr. Moeller and are concerned about retaliation. [Filing No. 68-9 at 5; Filing No. 68-13 at 4-5; Filing No. 68-13 at 11.] She advised that Dr. Moeller would touch, pat, massage, and rub other female students on a regular basis without their permission, and

that this conduct had been going on for a long time.  [Filing No. 68-9 at 4; Filing No. 68-13 at 10-11.]  Dr. Moeller denies that this third incident occurred.  [Filing No. 79-4 at 17-19.]

### D.  The Investigation

On October 17, 2014, Dr. Peterson met with the Clinic B students and informed them that the OEO may be contacting them, but she did not mention or refer to Dr. Moeller by name and did not provide any information regarding the nature of the investigation.  [Filing No. 68-8 at 7.]  Ms. Arvin then proceeded to conduct an investigation pursuant to the University's Operating Procedures for Processing Complaints of Discrimination.  [Filing No. 68-9 at 13; Filing No. 68-15.]  She interviewed twelve current students (eight female and four male), one former student, two faculty members, and one staff member.  [Filing No. 68-9 at 18; Filing No. 68-16.]  Of the eight current female students interviewed, six advised that Dr. Moeller had massaged or rubbed their back without permission.  [Filing No. 68-9 at 9-19; Filing No. 68-17.]  Several students also advised that Dr. Moeller's conduct made them feel uncomfortable and that they avoided being alone with him.  [Filing No. 68-9 at 9-10; Filing No. 68-9 at 16-20.]  Other Clinic B students stated that they had not witnessed Dr. Moeller "patting, rubbing and/or massaging the backs and shoulders of female students," but had heard that: (1) he "gives a lot of people massages, both guys & girls," [Filing No. 79-7 at 1]; (2) he is "going to grope you, massage shoulders[,] touch you in a creepy way [that] feel[s] uncomfortable,"  [Filing No. 79-8 at 1]; (3) a student was being moved out of clinic because she had claimed that she would be sitting at her desk and he would approach her from behind and grab her shoulder, [Filing No. 79-9 at 1-2]; and (4) he gave back rubs to females, [Filing No. 79-12 at 2].

One of the former female students Ms. Arvin interviewed advised that several years before, Dr. Moeller was standing behind her while she was showing him something on her laptop when

he put his hands on her shoulders, reached down, and touched the top of her bra next to her breast.

[Filing No. 68-9 at 11-12.]  The former student did not file a formal complaint against Dr. Moeller,

but was moved to another clinic after the incident.  [Filing No. 68-9 at 12.][3]

### E.  Dr. Moeller's Response

Dr. Moeller received a Notice of Complaint from the OEO on October 23, 2014.  [Filing

No. 68-1 at 11; Filing No. 68-14.]  The Notice of Complaint reads as follows:

> The Office of Equal Opportunity (the "Office") has received information from students in the School of Dentistry alleging that you engaged in conduct that, if true, may violate the Indiana University–Purdue University Indianapolis (IUPUI) Policy on Equal Opportunity, herein referred to as the "Policy."  The policy noted may be accessed through the following link to the OEO web page: http://www.iupui.edu/~oeo/policy/.  A copy of the policy is also enclosed for your ease of reference.
>
> Upon receipt of such information, the University is required to conduct an investigation in order to determine whether the Policy has been violated.
>
> THE ALLEGATIONS
>
> The complaint filed with the Office alleges sexual harassment against various students by you.  Below is a summary of the allegations which state that:
>
> 1. On a regular basis, you pat, rub, and massage the backs of female students, without their permission, making them feel uncomfortable and awkward while in your presence.
> 2. You were observed touching and rubbing the upper leg of a female student.
> 3. Your pattern of inappropriate touching behavior is long-standing and on-going.
> 4. Male and female students are "creeped out" by your inappropriate touching behavior.
> 5. Whenever possible, female students make a point of not being alone while in your presence.
> 6. Due to your position of authority in the School of Dentistry, students are intimidated by your inappropriate behavior and fear retaliation by you.

[Filing No. 68-14 at 4.]

The Notice of Complaint described Dr. Moeller's rights as follows:

---

[3] Dr. Moeller denies that this specific incident occurred.  [Filing No. 68-1 at 15; Filing No. 68-9 at 14.]

YOUR RIGHTS

· You are presumed innocent of the allegations unless and until there is a final administrative finding of culpability or an admission by you that the allegations made are true.

As the Respondent or "subject" of the complaint, you have the right to be informed of the complaint and to submit a written response to the allegations. That written response may be as long as you deem appropriate, but should contain only those relevant statements and materials that you reasonably believe support your view of the important facts. In your written response you are urged to submit the names (with accompanying addresses, telephone numbers, and email addresses) of individuals who may have direct and relevant information about the specific allegations. Such information should relate to the witness' personal experience or observation and should tend to establish either the truth or falsity of the allegations.

In addition to addressing the important facts contained in the allegations, you may also provide a written analysis of whether, in your opinion, the facts support a finding that you have violated the standards contained in the Policy.

Finally, you will be afforded the opportunity to verbally present your position to the Office during a personal interview. It is suggested, however, that your written response, if any, to the allegations be submitted to us at least three (3) workdays prior to the scheduled interview.

It is your decision whether to seek the advice and assistance of your own legal counsel to help prepare your position during the investigation. The University will not reimburse you for legal fees or the cost associated with retaining the services of a personal attorney. In addition, it would be inappropriate for University counsel to represent you personally during the investigation, and you should not ask University counsel to do so or to provide you with personal legal advice.

If you elect to have your personal counsel present during your interview, you may do so; however, your counsel will not be permitted to answer questions for you, to make statements on your behalf, or to delay or interrupt the interview. If your counsel elects not to observe these conditions, he/she will be excused from the remaining portions of the interview. Finally, if your counsel is present at the interview, it is likely that University Counsel will also be present.

The Decisional Authority will notify you of the decision and what, if any, disciplinary or remedial measures may be imposed or implemented.

[Filing No. 68-14 at 6.]

      Dr. Moeller submitted a written response to the OEO on November 3, 2014, stating:

Explanation (Not Excuse) for Matthew C. Moeller Behavior in Question

The physical gestures noted in the complaint occurred, but not in the context suggested. The frequency of the touching and its effect seem exaggerated. I understand that students might reasonably choose to not give me recognizable negative feedback.

I attended Indiana University School of Dentistry as a student from 1981 to 1985. I have been a faculty member 29 years. I vowed to never forget how difficult and discouraging dental school can be for most students. I take pride in having accomplished such a difficult goal, but I also am grateful for those who encouraged me. I am known to hold my students to the highest levels of performance. I have attempted to be not just hard, but hard and friendly. Countless graduates have thanked me for one, the other, or both.

I have been treated for clinical depression for the better part of 22 years. This has been a particularly difficult year, but with professional help I am learning much, and this needed change in my behavior can be part of my continued growth. I always have, and probably always will, strongly associate affectionate gestures with caring and support. About two weeks ago a student thanked me for something and gently touched my forearm. I smiled inside and out. I share my medical history not as a bid for sympathy or leniency, but rather as a factual disclosure of a significant influence on my personality/behavior.

Before I continue, let me stress that I am submitting an explanation, not an excuse. However innocent I think my intention, it remains a serious mistake that must never happen again. Since receiving the notice of investigation, I have obviously been more aware of myself in regards to physical gestures. Despite narrow passages and cramped treatment areas, I have put myself on "zero tolerance", and the needed change is already in effect.

To give detail to my generalizations, I remember well touching ▮▮▮▮▮▮▮ left thigh just above the knee at 7:59 that Thursday morning. Since another faculty member leads seminar, I sit with the students and evaluate participation. The chairs were set closely and as I sat down I greeted her with something to the effect of "How are you doing, ok?" I immediately knew that my quick touch was inappropriate and I verbally apologized to her within 24 hours. She assured me that she was not offended, but I acknowledge that all is rarely as it appears (or even expressed with words!).

Almost all my students are anxious about not having enough dental patients to fulfill graduation expectations. I have no additional patients to assign so all I can do is extend compassion and encouragement. You may roll your eyes at this, but I can say it in earnest: I am driven to comfort and support, but regretfully, on occasion, I have attempted it in a fashion that works for me, but not for everyone. ▮▮▮▮▮▮ is one of numerous students that have expressed concern about not having enough patients. This is why I greeted her as I did. In addition, I have also tried to be especially friendly to the International Dental Program students because they are merged into a class of students that have already known each other for two years. This is a new program and IUSD is trying hard to make it work well.

11

I apologize to my employer for my disappointing behavior. I realize there are huge financial risks associated with sexual harassment. I have tried to show that my behavior was not about amorous attraction or sex and it was not about harassment. I ask for forgiveness of behavior that however well-intentioned, was received or observed with offense. I am re-programming my errant reflexes. In acknowledging that it shouldn't have taken an investigation to change me I offer *explanation,* but no *excuse.* I should have recognized the danger inherent in all unrequested touching. I am sorry.

If it can advance this stressful investigation, know that I would not contest zero tolerance probation. In this way I can continue with good cheer my valuable work at IUSD. I have no history of vindictive retribution. All students remain an equal customer. I would vehemently deny ever giving preferential treatment to one student over another based on anything other than progress data and occasionally special patient needs. From my perspective no students would need to be transferred to another clinic.

[Filing No. 68-18 at 3-4.][4]

Ms. Arvin interviewed Dr. Moeller on December 3, 2014 in the presence of Dr. Kirkland. [Filing No. 68-2 at 2; Filing No. 68-9 at 17; Filing No. 68-19.] During the interview, Dr. Moeller again admitted to touching the student's thigh, and to rubbing and massaging the backs of female students without their permission. [Filing No. 68-1 at 12; Filing No. 68-2 at 3; Filing No. 68-9 at 18.] He also told Ms. Arvin that his conduct was "inappropriate," but claimed that it was not "sexual harassment." [Filing No. 68-19 at 3.]

During his interview, Dr. Moeller also discussed three other incidents involving students. First, Dr. Moeller discussed sending a note to a student saying "I really enjoy you. Is there any chance to reciprocate?" [Filing No. 68-2 at 4-5.] This incident occurred in the late 1990s, and Dr. Moeller described it as follows:

> Back in 1998, there was a student, again, in Clinic C that I thought was an attractive person. And I left a note in her mailbox, and it went unanswered. And then [former Dean of Students Dr. Margot] Van Dis called me and said, you know, this student felt uncomfortable with this. And I'll always admire the advice that Dean Van Dis gave, and that is, "Student, you need to answer his question," and then, "Dr. Moeller, you need to leave her alone." And that was easy enough.

---

[4] The names of all students have been redacted from re-produced excerpts.

[Filing No. 68-1 at 9.] The student responded that she was not interested. [Filing No. 68-1 at 10.]

Second, in 2012 Dr. Moeller dated a student during her fourth year of dental school and for two years thereafter. [Filing No. 68-1 at 7-9.] Dr. Moeller informed the Assistant Dean of Student Affairs at the time about their relationship. [Filing No. 68-1 at 7-8.] The student was in Clinic C and Dr. Moeller was the director of Clinic B, but Dr. Moeller would have to oversee students in Clinic C "almost on a weekly basis." [Filing No. 68-1 at 8.]

Finally, Dr. Moeller discussed an incident when he invited a student from Clinic C to bring her dog over to a lake near his house to swim. [Filing No. 68-1 at 9.] The student declined the invitation. [Filing No. 68-2 at 5.]

On December 18, 2014, Ms. Arvin submitted her Report of Investigation (the "Report") to the Dean of the School of Dentistry, Dr. John Williams. [Filing No. 68-9 at 19; Filing No. 68-17.] Ms. Arvin prepared the Report in consultation with Dr. Kirkland, and Dr. Kirkland approved it. [Filing No. 68-9 at 19; Filing No. 68-21 at 3.] The Report stated, in part:

## ALLEGATIONS

▮▮▮▮▮ alleges that female students in the IUSD, including herself, are subjected to sexual harassment by Dr. Moeller. Specifically, ▮▮▮▮ alleges that:

1. On a regular basis, Dr. Moeller pats, rubs and massages the backs and shoulders of female students, without their permission, making them feel uncomfortable and awkward while in his presence.
2. Dr. Moeller touched and rubbed her upper leg.
3. Dr. Moeller's pattern of inappropriate touching behavior is long-standing and on-going.
4. Male and female students are "creeped out" by Dr. Moeller's inappropriate touching behavior.
5. Whenever possible, female students make a point of not being alone while in Dr. Moeller's presence.
6. Due to his position of authority, students are intimidated by Dr. Moeller's inappropriate behavior and fear retaliation by him.

This report is based on a review of supporting documentation and interviews conducted with 16 individuals in the IUSD, including Dr. Moeller. Personnel interviewed consists of faculty, staff and students (past and present) who interact regularly with Dr. Moeller and have direct information to help assess the validity of the allegations.

## SUMMARY OF INVESTIGATION

███████ asserts that Dr. Moeller, who is in a position of authority in the IUSD, inappropriately touches female students, including herself. Since beginning her clinical experience in Clinic B, ███████ says that Dr. Moeller regularly pats her back and massages her shoulders. According to ███████, there are three incidents which standout to support her allegations. The first time Dr. Moeller patted her on the back occurred at the end of July 2014. ███████ says that after asking Dr. Moeller about a radiograph she had taken, Dr. Moeller told her she followed the correct procedure and then patted her on the back. At first, ███████ didn't think anything about Dr. Moeller touching her – she just thought Dr. Moeller was encouraging her. However, Dr. Moeller continued the conversation telling ███████ that another faculty member, Dr. Vanchit John, told him "Indian girls don't like to be touched." ███████ wasn't sure why Dr. Moeller told her about Dr. John's statement because Dr. Moeller's touch wasn't something of concern at that time.

The second incident occurred during a Group Learning Activity (GLA) conducted by Dr. Judith Chin on September 4, 2014. According to ███████, Dr. Moeller stood in front of her while she sat in a chair. As Dr. Moeller bent down to greet her, he rubbed the top of her right leg close to her thigh. She says the touch lasted a couple of seconds. Dr. Moeller then sat in a chair next to her. Stunned, ███████ says she "froze" in her chair until the class was over wondering if the manner in which Dr. Moeller greeted her was common in American culture. She says Dr. Moeller's touch made her feel very awkward and uncomfortable. She recalls that at least two other students observed Dr. Moeller touch her on her upper leg. After GLA one of those students asked her, "What the hell is he [Dr. Moeller] doing with you?"

The third incident occurred on September 11, 2014 during another GLA wherein ███████ chose a seat as far away from Dr. Moeller as possible. According to ███████, when Dr. Moeller saw her, he purposefully dragged a chair over to sit next to her. At some point during GLA, Dr. Moeller massaged ███████ back while leaning in towards her. Again, she says she felt very uncomfortable and awkward. A male student sitting on the other side of ███████ observed what was happening and asked her if she

wanted to change seats with him. ███████ says that after exchanging seats with the male student, Dr. Moeller asked her, "Have I offended you?" ███████ responded to Dr. Moeller stating "no" because she was afraid to tell him exactly how she was feeling.

Information gleaned from witness interviews support ███████ allegations of inappropriate touching, pats, rubs and massages to the back and shoulders. A total of 12 students were interviewed – eight female and four male. Six of the eight female students interviewed report being touched inappropriately by Dr. Moeller making them feel uncomfortable. These students say that Dr. Moeller rubs, pats and massages their backs and shoulders and gives side hugs, without their permission. A former female student reports being moved from Clinic B in 2007 because Dr. Moeller put his hand

down the front of her top. In addition to behaviors of inappropriate touching, a related pattern of behavior manifested itself in Dr. Moeller's past actions with other students that include asking a former female student for a date, dating a former female student and initiating non-academic related email and text messaging exchanges with current female students.

████ also asserts that students are intimidated by Dr. Moeller and fear retaliation by him. ████ ████ says that she feared her career would be at-risk if she told Dr. Moeller to stop touching her. As director of Clinic B, Dr. Moeller is responsible for assigning patients to students. Students receive a specified number of points for each treatment performed on a patient; there is a cumulative number of points to meet graduation requirements. As a result, students have not confronted Dr. Moeller about his behavior because they worry he will not assign patients to them, thus they will not graduate. As one student said, "He [Dr. Moeller] has our fate in his hands." The majority of students contend that Dr. Moeller's behavior has gone unreported to IUSD administration in the past because they believe their concerns would not have been taken seriously.

In his written statement, Dr. Moeller admits the "physical gestures noted in the complaint occurred, but not in the context suggested." Dr. Moeller further wrote that however innocent his intentions, his behavior is a "serious mistake that must never happen again." During his interview, he reiterated these same sentiments saying that he pats, rubs and massages the backs and shoulders of students of both genders. Dr. Moeller says he is "driven to comfort and support" students, but understands, regretfully, that what works for him doesn't always work for everyone else.

Dr. Moeller admits to touching ████ thigh as he greeted her before a GLA in September 2014. According to Dr. Moeller, he immediately knew that his quick touch was inappropriate thus he verbally apologized to ████ within 24 hours of the incident. He says that ████ is one of numerous students that have expressed concern about not having enough patients. Additionally, he says that he tries to be especially friendly to the IU-IDP students because they are merged into a class of students that have already known each other for two years. Per Dr. Moeller, "That is why I greeted her as I did." Dr. Moeller acknowledges his conversation with Dr. John, referenced by ████ earlier in this report, that the Indian culture does not appreciate being touched.

Regarding related behavior, Dr. Moeller vehemently denies putting his hand down the front of a former female student's top. Per Dr. Moeller, IUSD administration never informed him why that student was moved from his clinic. However, he confirms that he had an amorous relationship with a former female student. According to Dr. Moeller, he wrote a letter to Dr. Robert Kasberg, then Assistant Dean for Admissions and Student Affairs, on February 12, 2011 informing Dr. Kasberg of the relationship. Although Dr. Moeller believes this relationship did not violate IU Code of Academic Ethics, he realizes that students perceive the relationship as ethically unacceptable. Moreover, Dr. Moeller concedes that texting and emailing female students when the purpose of the communication has no contextual academic connection is inappropriate.

According to Dr. Moeller, he holds his students to the highest levels of performance and attempts to be "not just hard, but hard and friendly." He is aware that most of his students are anxious about not having enough dental patients to fulfill graduation requirements. Because he has no additional patients to assign, even though he has advocated for such, all he can do is extend compassion and encouragement. Therefore, Dr. Moeller understands that students might be intimidated by him due to his position of authority at IUSD.

Dr. Moeller says his behavior is not about amorous attraction or sex, and although inappropriate, it is not sexual harassment because he did not ask for anything in return from the students. Dr. Moeller asks for "forgiveness of behavior that, however well-intentioned, was received or observed with offense." According to Dr. Moeller, he should have recognized the danger inherent in all unrequested touching, thus he has put himself on "zero tolerance" by re-programming his "errant reflexes." Dr. Moeller does not believe his behavior warrants dismissal from IUSD. He wants to be a better person and is willing to send an apology to students affected. Per Dr. Moeller, "I want to show humbleness and humility."

### FINDINGS AND CONCLUSIONS

The majority of female students interviewed support ████████ allegations that Dr. Moeller rubs, pats and massages their backs and shoulders and gives side hugs, without their permission. Moreover, most students interviewed expressed fear of not graduating due to Dr. Moeller's control over assigning patients and retaliation if they confronted him about his inappropriate behavior.

Dr. Moeller concedes that, however well-intended, his behavior is a "serious mistake that must never happen again." Although Dr. Moeller admits to giving students shoulder massages and back rubs, in addition to touching ████████ upper leg, he does not believe these incidents occurred in the context suggested by ████████. Dr. Moeller says his behavior, albeit inappropriate, is not sexual harassment because he did not ask for anything in return from the students – he was only providing comfort and support to the students.

While Dr. Moeller believes his actions do not rise to the level of sexual harassment, there is a preponderance of evidence to suggest that he did sexually harass female students in the IUSD resulting from his unwelcome physical conduct of a sexual nature with such students. Moreover, there is sufficient evidence to support that Dr. Moeller's conduct is long-standing and on-going which created an intimidating, hostile and offensive learning environment in the IUSD. Upon weighing the totality of evidence, combined with his own admission, it is determined that Dr. Moeller is responsible for the alleged misconduct. Therefore, the OEO's finding is that Dr. Moeller's actions violated the University's Policy Against Sexual Harassment, UA-03.

[Filing No. 68-17 at 2-4.]

### F. The Decision to Terminate Dr. Moeller

Dean Williams met with Dr. Moeller and Dr. George Willis, Dr. Moeller's supervisor, on December 19, 2014. [Filing No. 68-2 at 8-9.] Dean Williams informed Dr. Moeller that he would be "temporarily relieved of [his] director's supervisory role of students and suspended from further

clinic or student contact pending final determination of this matter," effective immediately. [Filing No. 68-23.]

Dr. Moeller sent an email to Dean Williams and Dr. Willis on December 22, 2014, which attached his November 3, 2014 response to the Notice of Complaint and stated:

This is my response to the assertions of the IUPUI Office of Equal Opportunity. In the 100 minutes in which Ginger Arvin and Dr. Kim Kirkland attempted to know me, I asked them if you would receive this document. "No, but it will be summarized." I want you to have it word for word. It is no less true today than on November 3rd. I am disappointed and angry. If my demotion is not momentary then I am not sure if I will quit in disgust or fight for justice. This is not meant to be a threat, but rather another clear communication about who I am, what I am thinking, and what I have (or haven't) done. Upon having been officially corrected, I do not believe I have made the same mistake twice. Hence, no pattern. I understand due process, and although I was stunned at what I was hearing, I remember the "for your protection". I am willing to be unfairly humiliated in public if it paves the way to reappointment to Clinic B directorship. I repeat: there is nothing sexual or harassing about what I have done. Reluctantly adapting to a new world, it took this much trouble to successfully correct some of my love-of-teaching reflexes, and we all would win by returning me to Clinic B under probation and "zero tolerance", I will risk my continued employment on the chance of another misrepresented episode of friendliness and encouragement. You both have known me more than 100 minutes. Please do the right thing. To the extent that this response does not address the concerns of your report, I am eager to discuss discrepancies. My heart is pure, my conscience is clear. If I had a little more information, I may be able to add insight into what is really happening here.

[Filing No. 68-24 at 1.]

Dean Williams met again with Dr. Moeller on January 22, 2015, [Filing No. 68-22 at 3; Filing No. 68-22 at 8], and on January 26, 2015, Dr. Moeller's counsel sent a letter to Dean Williams asserting that Dr. Moeller's conduct did not rise to the level of sexual harassment and that the investigation was "flawed," [Filing No. 68-25]. On March 15, 2017, Dr. Moeller emailed Ms. Arvin and others stating that "[a]t this time I would like to examine all records on me that relate to the administrative processing of periodic incidents involving faculty, staff, student, or patient concerns. I am interested in the time period of 1985 to date." [Filing No. 79-51 at 1.] Ms. Arvin responded to Dr. Moeller, stating that all of the allegations outlined in the Notice of Complaint were discussed at the December 3, 2014 meeting, where Dr. Moeller had a chance to verbally respond, to be represented by counsel, to provide a written response, and to submit additional materials. [Filing No. 79-51 at 2.] Ms. Arvin stated "[t]here are no other 'periodic

incidents involving faculty, [staff], student or patient concerns' that went into our investigation that you did not have an opportunity to address when we met or in writing. I did not have access to nor did I review your faculty files as part of my investigation, so I cannot speak to what is or is not in those files." [Filing No. 79-51 at 2.]

Dr. Moeller emailed Dean Williams again on March 24, 2015, detailing his position regarding the investigation of the allegations against him. [Filing No. 68-26.] He stated, in part:

Have you considered that the investigation and conclusion may be flawed? Are you prepared to personally endorse it? It concerns me that at our last meeting you did not know whether my response statement came before or after the interview. Be reminded that my response statement apologizes for incidental touching. It contests having sexually harassed anyone. I'm concerned that an appeal to Chancellor Bantz may call into question your endorsement of a flawed investigation and inadequate critique of the situation.

Have you spoken with the student(s) that I have allegedly offended? What outcome do they want? My guess is that they are horrified at how this concern has been processed.

Let me offer you an option for getting this mess off your desk. The following is how my grievance and your liability go away:

1.  As there are no comprehensive care clinics presently needing directors; in the spirit of give and take, I would be satisfied being returned to increased amounts of clinic and laboratory instruction. Recall my explaining "clinic freezes" to you. We have always been short of adequate chairside instruction. Please don't hastily dismiss such a qualified, needed resource.
2.  A vindication email of the following wording would be sent to all recipients of Dr. Willis's email of January 2, 2015: "Indiana University made a serious mistake in abruptly removing Dr. Moeller from 18 years of outstanding Clinic B leadership. He did not sexually harass anyone. Dr. Moeller forgives all involved. Please join me in welcoming Dr. Moeller back to the clinical and laboratory teaching that he loves." Dean Williams
3.  My pay level would not be reduced.
4.  Indiana University would reimburse to me all professional fees paid to Mr. Jay Mercer.
5.  I am also willing to be placed on some form of acceptable probation that would appease the OEO.

If Indiana University continues to be unwilling to cooperate with our attempts to problem solve, it is the school that advances this to litigation as the only remaining mechanism for getting a serious review of the "evidence" that supposedly supports the conclusion that I have sexually harassed one or more students.

In closing, let me continue the wonderful conversation that you and I enjoyed while traveling to and from South Bend. May I share the origin of my knee patting? When driving, five generations of Moellers have patted the knee of the shotgun passenger in the spirit of, "So, how's it going?" (Note it was not sexual). My ninety-year-old father told me, "Yes, your grandfather started that, and now his great-grandchild greets his great-great-grandchild in the same way."

[Filing No. 68-26 at 2.]

Dean Williams met with Dr. Moeller on March 26, 2015, and informed Dr. Moeller that he was "being dismissed for cause and that [his] employment with Indiana University School of

Dentistry [was] terminated, subject to the final approval of the Chancellor." [Filing No. 68-27.] Dean Williams based his decision on the OEO's investigation and also on his commitment "to an environment that's safe, both physically and emotionally safe environment, for the dental school community, including students, staff, and faculty." [Filing No. 68-22 at 7.]

### G. Dr. Moeller's Request for Reconsideration and Appeal

On April 3, 2015, Dr. Moeller's counsel sent a letter to Dean Williams which stated "[p]lease accept this letter as a Request for Reconsideration pursuant to Section 11 of the Indiana University Operating Procedures for Processing Complaint of Discrimination 'Operating Procedures.'" [Filing No. 68-28 at 2.] In the letter, Dr. Moeller's counsel discussed "[i]rregularities in [the] process," including "[f]ailure to follow Enforcement Principles," and "[f]ailure to follow Operating Procedures," and "[i]rregularities in [the] investigation." [Filing No. 68-28 at 2-6.] His counsel also argued in the letter that the facts did not support a finding that Dr. Moeller engaged in sexual harassment. [Filing No. 68-28 at 7-9.]

On April 14, 2015, Dean Williams responded to Dr. Moeller's counsel in a letter in which he stated that the OEO had "thoroughly considered and reviewed each alleged procedural defect raised in Dr. Moeller's Request for Reconsideration," summarized the events that had taken place, and responded to each of the procedural irregularities Dr. Moeller alleged took place. [Filing No. 68-29.] Dean Williams advised Dr. Moeller that he was upholding his original decision, and that Dr. Moeller could appeal to the Chancellor within ten days. [Filing No. 68-29 at 6.]

Dr. Moeller appealed Dean Williams' denial of his request for reconsideration to Chancellor Charles Bantz, and Chancellor Bantz denied Dr. Moeller's appeal on May 19, 2015. [Filing No. 68-2 at 16.] The University stopped paying Dr. Moeller on May 19, 2015. [Filing No. 68-30 at 2.]

### H. Dr. Moeller's Complaint to the Faculty Council

In the meantime, on April 3, 2015, Dr. Moeller submitted a complaint regarding the OEO to the Executive Committee of the Indiana University Purdue University Indianapolis Faculty Council (the "Faculty Council"). [Filing No. 68-31.] The complaint contained information similar to the information included in Dr. Moeller's Request for Reconsideration – it discussed "[i]rregularities in [the] process," and "[i]rregularities in [the] investigation," and claimed that the facts did not support a finding that Dr. Moeller engaged in sexual harassment. [Filing No. 68-31.]

The Faculty Council held a hearing, at which Dr. Moeller and his counsel were present, on May 19, 2015. [Filing No. 68-33 at 1.] On June 1, 2015, the Faculty Counsel issued its decision, finding that there were no irregularities in the OEO's "enforcement principles; the operating procedures; and the investigation," but that "the information about operating procedures for processing complaints of discrimination, given in writing to the respondent and posted on the OEO website, does not provide the kind of communication in clear English that enables an ordinary person to understand how those policies and procedures will apply in their case." [Filing No. 68-33 at 2.] The Faculty Council concluded that:

> Within the strictly limited focus of the hearing on the question of whether OEO's policies and procedures were duly observed and followed, the IFC-EC does not find fault. IFC-EC recommends, however, a much clearer explanation of OEO's policies and procedures, which would allow any visitor to the website, but especially faculty who are informed of a complaint, to know in clear English what to expect of the process, including who makes decisions at each point in the process, what the timeline is, what kinds of information the subject of the complaint can expect to receive about the complaint, the investigation and the findings, and what are the rights of anyone against whom there is a compliant at any point in the process.

[Filing No. 68-33 at 3.]

### I. Dr. Moeller's Grievance to the Faculty Board of Review

Also on April 3, 2015, Dr. Moeller filed a grievance with the Faculty Board of Review (the "FBR"). [Filing No. 68-34.] Dr. Moeller detailed five administrative actions that he was grieving,

and steps that he took to "redress the grievance." [Filing No. 68-34.] The FBR submitted its report

to Chancellor Nasser Paydar, Dr. Moeller, and others on November 3, 2015. [Filing No. 68-35.]

The FBR noted that a Faculty Board of Review was appointed, met twice to review documentation

provided by Dr. Moeller, and held a hearing on October 29, 2015 (which Dr. Moeller and his

counsel attended). [Filing No. 68-35 at 1.] The FBR found as follows:

1. The process and information used by Dean Williams in his decision to terminate Dr. Moeller violated Dr. Moeller's right to **adequate due process**.

   While recognizing that the School of Dentistry has a duty to protect its students, the Board of Review found procedural deficiencies in four aspects of the process:

   - Dean Williams stated that he relied primarily, if not solely, upon the Office of Equal Opportunity report. To his credit, Dean Williams testified that he met a second time with the OEO director to review the OEO findings to assure himself that the investigation had been properly conducted. Yet, Dr. Kirkland reported that typically the OEO report is only one piece of information that deans (decisional authorities) consider in the decision

     process. In his testimony, Dean Williams admitted that in making this decision he did not review Dr. Moeller's personnel files which included past student evaluations (including both course evaluations and program exit interviews). While the board agrees in principle that the university must not tolerate sexual harassment, it also recognizes employees have the right to feedback and where appropriate, the opportunity to remediate their behavior with a behavioral plan. The bulk of the information contained in Dr. Moeller's personnel file supports the inference that he is a "competent" clinician. In addition, Dr. Moeller's personnel file did not contain any prior documentation of behavioral incidents, warnings, or admonitions given by administrators to Dr. Moeller. During the hearing, an incident of inappropriate touching occurring in 2007 was mentioned, but Dr. Kirkland and Dean Williams indicated there was no official file or documentation of intervention or follow-up with Dr. Moeller.

   - This absence of documentation is troubling in this case as Dr. Kirkland testified that during the investigation some students stated it was common knowledge among students that something was happening in this clinic. Given the nature of two comments in the student exit interviews made in 2010 and 2011, as well as the initial report that triggered the OEO investigation, the board was surprised that neither the dean nor other administrators interviewed the clinical directors in adjacent clinics to determine whether the students in the clinic were being treated inappropriately.

- Despite the fact Dean Williams, at one point, stated he primarily relied on the OEO report in reaching his determination to terminate Dr. Moeller, Dean Williams also stated his decision to dismiss Dr. Moeller rather than to pursue other options was also based on his perception of Dr. Moeller's lack of "self-awareness." Dr. Kirkland also told the Board of Review that Dr. Moeller had "no sense of self-awareness." The fact that Dr. Moeller's lack of self-awareness influenced Dean Williams' decision raises issues related to due process. Despite the fact the issue of "self-awareness" was discussed by Dr. Kirkland and Dr. Williams apparently in their 'close-out meeting' which did not include Dr. Moeller, there was no testimony presented at the hearing that indicated Dr. Moeller was told his lack of self-awareness was at issue in this process. Nor was he given the opportunity to respond to this claim. This term does not appear in the documentation provided to the board, and at the hearing, Dean Williams did not indicate he mentioned this to, or directly questioned Dr. Moeller, about this factor.

- Although Dean Williams described instances in which the School of Dentistry addressed behavioral issues of various faculty members by implementing behavioral plans, at the hearing, the board was unsure why Dean Williams did not consider such behavioral remediation plans such as warning and probation, given there was no documented prior incident and warning related to sexual misconduct in the school's or OEO's records. Nor is there evidence that Dr. Moeller could not correct his behavior given the appropriate guidance. Apparently, the failure to consider other alternatives was due to the fact that

Dean Williams had lost trust in Dr. Moeller. However, the procedurally-flawed conclusion about Dr. Moeller's lack of self-awareness undoubtedly played a role in the Dean's conclusion that there had been a breach of trust.

[Filing No. 68-35 at 3-5.]  The FBR also concluded that "[t]he decision-making process did not meet the requirements of essential fairness," stating:

Dr. Moeller did not receive adequate information about the evidence that formed the basis for the conclusion he had violated university policy. Although Dr. Moeller was notified of the initial allegations, which were sent in the notice of complaint he received at the onset of the investigation, Dr. Moeller apparently met with the OEO on only one occasion. He had one interview, which he believed went well, but then was provided no opportunity for a second interview, questions, or a sufficient opportunity for rebuttal until the OEO had concluded their report and finding, which they presented solely to Dean Williams. In addition, the OEO had two discussions with Dean Williams that played a role in Dean Williams' decision-making. Although Dean Williams met with Dr. Moeller at the end of February, there is no evidence that Dr. Moeller received a copy of the OEO report or was apprised that his lack of self-awareness could

lead to his termination. Although the board respects the fact the university must protect individuals who report sexual harassment, if a finding of sexual harassment will lead to termination, the faculty member who is facing termination must be afforded an adequate opportunity to understand the nature of the allegations against him or her, the extent of those allegations, as well as the nature of the information used against the faculty member, to protect their rights to due process.

[Filing No. 68-35 at 5.]  The FBR recommended that:

- Dr. Moeller be provided with a redacted copy of the OEO report that protects the privacy of the interviewees but details the specific evidence that led to the OEO conclusion that, by a preponderance of their evidence, Dr. Moeller violated the university policy on sexual harassment. This information should include the dates of such conduct, the nature of the conduct, as well as detail any contrary information, e.g. from students who reported Dr. Moeller never treated them in an inappropriate manner and/or faculty who

  never observed this behavior or have a different opinion/perspective of the observed behavior.

- The OEO interview Dr. Moeller a second time, and take other actions as necessary, to complete the investigation and consider any new arguments or evidence that he provides.

- Dean Williams provide Dr. Moeller a full explanation of the factors, and their weight, that caused him to choose dismissal (or other sanction), and allow Dr. Moeller to submit an oral or written response (as Dr. Moeller chooses) in response to the specific factors. Assuming that not just past behavior (reviewed in the investigation) but "self-awareness," a "lack of trust," and a presumption of inability to control behavior are significant factors, both parties should provide specific evidence on these points.

[Filing No. 68-35 at 5-6.]

Chancellor Paydar sent Dr. Moeller a letter on December 1, 2015, stating:

While I am not convinced about the Board's impression that the handling of this matter was procedurally deficient or unfair, after careful consideration of the report, I am willing to accept their recommendations of some additional process steps before this matter is concluded, subject to the following conditions:

(1) You will be provided a redacted copy of the December 2014 OEO investigatory report;
(2) You will have the opportunity to respond to the redacted investigative report in writing and in-person with Director Kim Kirkland; Dr. Kirkland will consider any new arguments or evidence you provide and revise her report to the Dean as she deems necessary.

(3) Dean Williams will provide you with a written explanation of his decision to dismiss you and allow you submit an oral or written response (as you choose); he will place a copy of these documents, along with the redacted investigatory report, in your permanent faculty file;

(4) I will then review the Dean's explanation, along with your response, and my decision will be final; there will be no additional process or appeal steps and you agree to waive any appeal rights, including claims of due process or otherwise, internally or externally.

(5) Alternatively to the process steps outlined in 1-4 above, you may resign retroactively to the date of your termination.

[Filing No. 68-36 at 1-2.]

Dr. Moeller declined Chancellor Paydar's offer to take these additional steps recommended by the FBR because, in part, "[t]he overall tone of the letter offended [him] in that, although [he] realize[d] [Chancellor Paydar] was in a tricky dance being a fairly new chancellor and dealing with ongoing faculty, but it jumped out at [Dr. Moeller] when [Chancellor Paydar] said 'I'm not convinced about the board's impression.' [Dr. Moeller] thought that was an insult to some faculty members that had put in a very strong effort and that it was not an impression; it was findings." [Filing No. 68-2 at 18-19.] Dr. Moeller also declined the offer because it was conditioned on him waiving any appeal rights, either internal or external. [Filing No. 68-2 at 18-19.]

On December 9, 2015, Chancellor Paydar wrote a memorandum to Dr. Moeller stating "I understand that you are rejecting the additional process steps recommended by the Board of Review and outlined in my December 1, 2015 memo. Accordingly, as I mentioned before, I am affirming the Dean's decision to terminate your faculty appointment for cause because of serious personal and professional misconduct." [Filing No. 68-37.] Dr. Moeller appealed Chancellor Paydar's decision to Indiana University President Michael McRobbie on December 7, 2015, and President McRobbie denied Dr. Moeller's appeal on February 3, 2016 stating:

I sincerely wish you had availed yourself of the opportunity for additional explanation of Dean Williams' decision to terminate you and of an opportunity to review the investigation report by the [OEO]…[which] offered you another opportunity to review and respond to the allegations against you, including an opportunity to receive and review a written explanation from Dean Williams of his

24

decision to dismiss you. Rather than take advantage of this generous offer for additional review, you failed to respond and thus did not participate in any further process. Yet you have lodged an appeal based on the claim you have been denied due process.

[Filing No. 68-38.]

### J. The Lawsuit

On February 25, 2016, Dr. Moeller initiated this lawsuit against the University, President McRobbie, Chancellor Paydar, Chancellor Bantz, Dean Williams, and Dr. Kirkland. [Filing No. 1.] Dr. Moeller asserts claims for: (1) violation of his Fifth and Fourteenth Amendment right to procedural due process pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 against all Defendants; (2) breach of contract against all Defendants; and (3) breach of the covenant of good faith and fair dealing against the University and Dean Williams.[5] [Filing No. 1 at 9-15.] Dr. Moeller seeks a declaratory judgment; an injunction preventing Defendants from engaging in future due process violations; an order that Dr. Moeller be reinstated as Clinic Director and Clinical Assistant Professor with "full back pay and benefits as well as front pay and benefits in kind"; compensatory, liquidated, and punitive damages; pre- and post-judgment interest; and attorneys' fees and costs. [Filing No. 1 at 15-16.] Defendants have moved for summary judgment on all of Dr. Moeller's claims, [Filing No. 68], and thereafter Dr. Moeller moved to dismiss without prejudice his breach of contract and breach of the covenant of good faith and fair dealing claims, [Filing No. 80]. Both motions are now ripe for the Court's decision.

_____

[5] Dr. Moeller's original Complaint included claims for defamation and intentional infliction of emotional distress, [Filing No. 1 at 12-13], but Dr. Moeller consented to the dismissal of those claims with prejudice because he failed to comply with the Indiana Tort Claims Act, [Filing No. 20], and the Court dismissed those claims on May 12, 2016, [Filing No. 21].

Dr. Moeller moved to voluntarily dismiss his breach of contract and breach of the covenant of good faith and fair dealing claims on the same day that he filed his response to Defendants' Motion for Summary Judgment, initially providing no legal ground for the dismissal. After Defendants responded by objecting, he argued that those claims should be dismissed without prejudice because the Court lacks subject matter jurisdiction over them based on the fact that Defendants claim they are immune under the Eleventh Amendment. [Filing No. 80; Filing No. 83.] Defendants have moved to file a surreply to address arguments related to the interplay between Eleventh Amendment immunity and subject matter jurisdiction. [Filing No. 84.] Because Dr. Moeller raised his argument regarding the Eleventh Amendment and subject matter jurisdiction for the first time in his reply brief in support of his Motion to Dismiss, the Court will **GRANT** Defendants' Motion for Leave to File Surreply in Opposition to Plaintiff's Motion to Dismiss Counts Two and Five, [Filing No. 84], and consider Defendants' surreply in opposition to Dr. Moeller's Motion to Dismiss, [Filing No. 84-1].

Dr. Moeller moved to dismiss his breach of contract and breach of the covenant of good faith and fair dealing claims nearly one and one-half years after initiating this litigation, and only when faced with Defendants' Motion for Summary Judgment in which they argued – convincingly, as discussed below – that Eleventh Amendment immunity bars those claims as against the University. Defendants surmise that Dr. Moeller seeks dismissal of those claims without prejudice so that he may bring them in a state court lawsuit, and that it would be improper to allow him to do so. They argue that dismissal under Fed. R. Civ. P. 41(a)(2) is improper. Dr. Moeller insists that he does not base his Motion to Dismiss on Rule 41(a)(2), but rather argues that dismissal is

necessary because Eleventh Amendment immunity divests the Court of subject matter jurisdiction over those claims.

First, the Court finds it improper to allow Dr. Moeller to obtain a dismissal without prejudice of his breach of contract and breach of the covenant of good faith and fair dealing claims. While Dr. Moeller insists that he does not seek dismissal under Rule 41(a)(2), the only basis he sets forth for his motion – that Eleventh Amendment immunity divests the Court of subject matter jurisdiction over those claims – is meritless, as discussed below. Rule 41(a)(2) allows dismissal by court order "on terms that the court considers proper," which provides the district court with "wide discretion…." *Jack Gray Transport, Inc. v. AT&T Corp.*, 2017 WL 633848, *1 (N.D. Ind. 2017) (citing *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 177 (7th Cir. 1994)). The Seventh Circuit has instructed that courts should not allow dismissal without prejudice if the defendant would suffer "plain legal prejudice," *Kovalic v. DEC Int'l, Inc.*, 855 F.2d 471, 473 (7th Cir. 1988). Factors to consider in determining whether plain legal prejudice exists include: "(1) the defendants' effort and expense of preparation for trial, (2) whether there has been excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, (3) the sufficiency of the plaintiff's explanation for the need to take a dismissal, and (4) whether the defendant has filed a motion for summary judgment." *Jack Gray Transport*, 2017 WL 633848 at *1 (citing *F.D.I.C. v. Knostman*, 966 F.2d 1133, 1142 (7th Cir. 1992)). Based on these factors, the Court finds that Defendants would suffer plain legal prejudice if the claims were dismissed without prejudice. As noted above, the parties have been litigating this case for quite some time. Discovery is complete and trial has been set for January 2018. Defendants have moved for summary judgment, setting forth numerous arguments related to the breach of contract and breach of the covenant of good

faith and fair dealing claims.  Allowing Dr. Moeller to change course and presumably pursue those claims in state court after litigating them here would be unfair to Defendants.

Dr. Moeller's argument that the application of Eleventh Amendment immunity warrants dismissal without prejudice fails as well.  The Eleventh Amendment does not take away a federal court's subject matter jurisdiction unless the defense of Eleventh Amendment immunity has been waived.  *See Turner v. State of Indiana Teachers' Retirement Fund*, 2008 WL 2324114, *1 (S.D. Ind. 2008).  Here, Defendants did not waive Eleventh Amendment immunity, but rather raised it both in their Answer to Dr. Moeller's Complaint, [Filing No. 14], and as grounds for summary judgment.  The availability of sovereign immunity for Dr. Moeller's breach of contract and breach of the covenant of good faith and fair dealing claims does not divest the Court of subject matter jurisdiction over those claims.  Dr. Moeller's Motion to Dismiss is **DENIED**.  [Filing No. 80.]

### III.
#### MOTION FOR SUMMARY JUDGMENT

#### A.  Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R.

Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**B. Discussion**

In support of their Motion for Summary Judgment, Defendants argue that: (1) Dr. Moeller's § 1983 claims are barred by the Eleventh Amendment; (2) Dr. Moeller's due process claim fails as a matter of law; (3) Dr. Moeller's breach of contract claim fails as a matter of law; (4) Dr. Moeller's breach of the covenant of good faith and fair dealing claim fails as a matter of law; and (5) Dr. Moeller is not entitled to back or front pay on his claims because he failed to mitigate his damages. [Filing No. 90 at 17-38.] The Court addresses the arguments in turn.

*1. Eleventh Amendment Immunity*

Defendants argue that the University is entitled to sovereign immunity under the Eleventh Amendment because the University "is an 'instrumentality' or 'arm' of the State of Indiana for purposes of the Eleventh Amendment," and has not waived immunity or otherwise consented to the lawsuit. [Filing No. 90 at 17.] Defendants also assert that Eleventh Amendment immunity extends to individual defendants being sued in their official capacities, except for prospective injunctive relief. [Filing No. 90 at 18.] They argue further that Dr. Kirkland, Dean Williams, Chancellor Bantz, Chancellor Paydar, and President McRobbie (the "Individual Defendants") being sued in their individual capacities are entitled to sovereign immunity where the claims against them are not bona fide individual capacity claims, but "seek relief that would expend itself on the public treasury." [Filing No. 90 at 18 (quotation omitted).] Defendants contend that because Dr. Moeller seeks damages for economic loss from them arising out of his employment, any judgment would expend itself on the public treasury. [Filing No. 90 at 18.]

30

Dr. Moeller responds that "[w]hile the Eleventh Amendment may bar some claims against [the University], it does not thwart the claims against the officials in their official capacities for injunctive relief of reinstatement." [Filing No. 89 at 28.] He contends that he is suing the Individual Defendants in both their individual and official capacities, and that the officials may be sued for damages in their individual capacities. [Filing No. 89 at 29-30.] Dr. Moeller asserts that any agreement the University may have to indemnify its employees does not make its employees sovereigns. [Filing No. 89 at 31.]

In reply, Defendants argue that Dr. Moeller has conceded that the University is immune from the lawsuit in its entirety under the Eleventh Amendment and that the Individual Defendants in their official capacities are immune from his claims for monetary damages. [Filing No. 91 at 4.] The University reiterates its argument that claims for monetary damages against the Individual Defendants in their individual capacities are barred by the Eleventh Amendment, not because of an agreement for the University to indemnify them, but because the lawsuit "bears no resemblance to a bona fide individual capacity suit." [Filing No. 91 at 4-5 (citation and quotation omitted).] Defendants note that Dr. Moeller "is seeking to accomplish exactly what he would have wanted to accomplish if he were permitted to maintain his suit against the University – he is seeking to force the University to reinstate him or pay him what he would have earned had he remained employed for the duration of his seven-year appointment." [Filing No. 91 at 5.]

a. The University

Eleventh Amendment immunity bars suits against states and their agencies regardless of whether the relief sought is monetary damages or injunctive relief. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996); *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984). As discussed more fully below, however, a state official is not entitled to Eleventh

Amendment immunity where the relief sought is prospective injunctive relief to remedy an ongoing violation of federal law. *Ex parte Young*, 209 U.S. 123, 123 (1908). Here, Dr. Moeller appears to concede that the University is entitled to sovereign immunity in connection with all of the claims it faces. [*See* Filing No. 89 at 28 (stating that "Eleventh Amendment may bar some claims against [the University]," and continuing to argue only that the Individual Defendants are not entitled to sovereign immunity for claims against them in their official capacities for prospective injunctive relief or for claims against them in their individual capacities).] The Court notes that the parties do not address – and appear to assume – that the Board of Trustees of Indiana University d/b/a Indiana University School of Dentistry is a state entity. This is, in fact, the case. *See* Ind. Code § 21-20-2-1 ("Indiana University is recognized as the university of the state"); *Sung Park v. Indiana University School of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012) (Indiana University School of Dentistry "is an arm of the State of Indiana").

Because the University is a state entity, and since it has not consented to being sued in federal court, Dr. Moeller's claims against the University – both for monetary damages and for injunctive relief – are barred by Eleventh Amendment immunity. *McDonough Associates, Inc. v. Grunloh*, 722 F.3d 1043, 1049 (7th Cir. 2013) ("the general rule is that private individuals are unable to sue a state in federal court absent the state's consent"). Defendants' Motion for Summary Judgment as it relates to all claims against the University is **GRANTED** on the grounds of Eleventh Amendment sovereign immunity.

b. The Individual Defendants

*Ex parte Young* established an exception to states' sovereign immunity under the Eleventh Amendment permitting suits for prospective relief. *Ex parte Young*, 209 U.S. 123. A plaintiff may file "suit [ ] against state officials seeking prospective equitable relief for ongoing violations

of federal law...." *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir. 1997); *see also Indiana Protection and Advocacy Services v. Indiana Family and Social Services Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) (discussing exceptions to the Eleventh Amendment's bar to actions in federal court against state officials acting in their official capacities). The Individual Defendants are all state officials. Dr. Moeller only asserts claims against the Individual Defendants in their official capacities for declaratory and injunctive relief, [Filing No. 1 at 3-4], and also appears to concede that the Individual Defendants are entitled to sovereign immunity for claims made against them in their official capacities for monetary damages. [*See* Filing No. 89 at 28 (Dr. Moeller arguing that the Eleventh Amendment "does not thwart the claims against the officials in their official capacities for injunctive relief of reinstatement," and does not bar claims against the officials in their individual capacities, but not addressing immunity for claims against officials in their official capacities for monetary damages).] This is because it is well-settled that claims against the Individual Defendants in their official capacities for monetary relief are barred by the Eleventh Amendment. *See McDonough Associates*, 722 F.3d at 1050 (Eleventh Amendment bars claims seeking "awards of 'accrued monetary liability which must be met from the general revenues of a State'") (quoting *Edelman v. Jordan*, 415 U.S. 651, 664 (1974)).

Dr. Moeller also asserts claims against the Individual Defendants in their individual capacities for monetary damages. [Filing No. 1 at 3-4.] The Eleventh Amendment does not bar claims against state officials sued in their individual capacities for either monetary or injunctive relief. *See Mutter v. Rodriguez*, 700 Fed. Appx. 528, 528 (7th Cir. 2017) (Eleventh Amendment "does not bar suits against state officials if they are sued...in their individual capacities for damages under 42 U.S.C. § 1983") (emphasis omitted). Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment to the extent that the Individual Defendants are not

entitled to sovereign immunity for the claims Dr. Moeller asserts against them in their individual capacities.[6]

### 2. *Due Process Claim*

Defendants argue that Dr. Moeller's due process claim fails as a matter of law because Dr. Moeller does not have a federally protected right in University procedures, and any deviation from those procedures cannot form a basis for a due process claim. [Filing No. 90 at 23.] Defendants also contend that, in any event, Dr. Moeller received all of the process he was due, including receiving notice of the charges against him, responding in writing to those allegations, and having multiple opportunities to be heard. [Filing No. 90 at 21-22.]

In his response, Dr. Moeller argues that he has a protectable property interest in his thirty years as a University employee. [Filing No. 89 at 10-11.] He then details several alleged flaws in the University's investigation, including that: (1) Dr. Kirkland had "broadly delegated, uncircumscribed power" to determine if sexual harassment had occurred; (2) the Notice did not advise him of the complaints made against him; (3) Dr. Kirkland controlled the investigation, determined the facts, and made the final decision; (4) Dean Williams could only determine the sanctions, not the finding of a policy violation; (5) Dr. Moeller did not have the opportunity to have Dr. Kirkland's decision that he had violated University policy reviewed; (6) The Faculty Council Executive Committee meeting on May 19, 2015 and the Board of Review hearing did not afford Dr. Moeller the opportunity to review or challenge Dr. Kirkland's conclusion; and (7) Dr.

---

[6] Defendants argue that Dr. Moeller's claims against the Individual Defendants in their individual capacities are not bona fide individual capacity claims because his claims are based on his employment and on "decisions and actions taken by individual employees of the University within the scope of their employment." [Filing No. 91 at 5.] As discussed below, the Court finds that Dr. Moeller's claims against the Individual Defendants fail as a matter of law in any event. Accordingly, it need not, and will not, consider whether the claims against the Individual Defendants in their individual capacities are bona fide individual capacity claims.

Kirkland's decision was "predictable and authorized" because she was given "broadly delegated, uncircumscribed power" to determine whether Dr. Moeller had engaged in sexual harassment. [Filing No. 89 at 14-23.] Dr. Moeller also argues that he was entitled to a pre-deprivation hearing. [Filing No. 89 at 24-28.]

In their reply, Defendants argue that Dr. Moeller applies the wrong standard to his due process claim, and that he received adequate pre-deprivation process. [Filing No. 91 at 10-11.] Defendants argue that the deprivation of rights occurred when Dr. Moeller was terminated, not when the OEO made its determination and that, in any event, Dr. Moeller received adequate due process before the OEO made its decision. [Filing No. 91 at 10-11.] Defendants set forth several instances where they contend Dr. Moeller was given an opportunity to present his side of the story or question Dr. Kirkland's decision before his termination. [Filing No. 91 at 12-14.] Specifically, Defendants note that Dr. Moeller had three pre-termination meetings with Dean Williams, sent emails and a letter to Dean Williams, attended two hearings, and participated in appeals to the Chancellor and to the President that were conducted after Dean Williams made the decision to terminate him. [Filing No. 91 at 12.] Defendants argue that Dr. Moeller received notice of the allegations against him when he was provided the Notice of Complaint, and that he "clearly understood the charges against him because he responded to those charges by admitting that he engaged in the alleged conduct. Specifically, he submitted written responses to the OEO and to Dean Williams and participated in an in-person interview with the OEO." [Filing No. 91 at 13.]

The Fourteenth Amendment's Due Process Clause prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. A procedural due process claim requires Dr. Moeller to demonstrate: "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Khan v. Bland,*

630 F.3d 519, 527 (7th Cir. 2010). The analysis of a procedural due process claim is two-fold – the Court must consider: (1) "whether the defendants deprived the plaintiff of a protected liberty or property interest"; and (2) if so, "what process was due." *Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir. 2000).

a.  Deprivation of Protected Property Interest

Defendants argue that the University's policies and procedures do not create a protectable property interest for Dr. Moeller, and the Court agrees. *See Babchuk v. Indiana University Health, Inc.*, 809 F.3d 966, 970 (7th Cir. 2016) ("the existence of [procedures for terminating medical privileges of doctors] creates no entitlement to continued privileges. 'Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement'") (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983)). Dr. Moeller argues, however, that the protectable property interest he bases his due process claim on is his "30 years as an employee of IU." [Filing No. 89 at 10.] Defendants do not contest this theory in their reply brief, instead "assum[ing] for purposes of summary judgment that Dr. Moeller had a protectable property right in continued employment for the duration of his seven-year appointment." [Filing No. 91 at 9.] The Court will do the same and, in any event, finds this to be consistent with the Seventh Circuit's recognition of a protectable property interest in continued employment for public employees who can only be terminated for good cause. *See, e.g.*, *Grant v. Trustees of Indiana University*, 870 F.3d 562, 571 (7th Cir. 2017).

b.  Whether Dr. Moeller Received Due Process

Due process "is flexible and requires only such procedural protections as the particular situation demands." *Riano v. McDonald*, 833 F.3d 830, 834 (7th Cir. 2016) (citations and quotations omitted). An institution's internal rules do not set the standard for whether the due

process required by the federal Constitution has been provided. *Grant*, 870 F.3d at 571 (citing *Osteen v. Henry*, 13 F.3d 221, 225 (7th Cir. 1993)). Instead, "[t]he cornerstone of due process is notice and the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Grant*, 870 F.3d at 571 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). In order to analyze the pre-termination process, the Court will consider: "(1) the private interest affected by the official action; (2) 'the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) the University's interest, 'including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Grant*, 870 F.3d at 571 (quoting *Mann v. Vogel*, 707 F.3d 872, 879 (7th Cir. 2013)).[7]

The first factor weighs in favor of Dr. Moeller, as his interest in maintaining his employment is great. *See Gilbert v. Homar*, 520 U.S. 924, 932 (1997). The Court now considers in connection with the second factor whether the evidence shows that Dr. Moeller "was afforded notice and a detailed explanation of the charges and the evidence against him …." *Grant*, 870 F.3d at 572. As for notice of the charges, the Court rejects Dr. Moeller's argument that the Notice did not adequately inform him of the allegations against him. To the contrary, the Notice set forth six allegations against Dr. Moeller, including that: (1) he pats, rubs, and massages the backs of female students, without their permission, making them feel uncomfortable and awkward; (2) he

---

[7] Dr. Moeller advocates for the application of a standard whereby the Court would determine whether the conduct at issue was authorized and not random, such that he was entitled to pre-deprivation process. [Filing No. 89 at 12-14 (quotations and citations omitted).] As the Seventh Circuit recently explained, "[i]n some situations when a government official tortiously deprives a person of property or liberty randomly and without authorization, it is impractical to insist on a pre-deprivation hearing." *Simpson v. Brown County*, 860 F.3d 1001, 1007 (7th Cir. 2017). This defense to the argument that pre-deprivation process was required has no application here, where Dr. Moeller in fact received a great deal of process before he was terminated.

was observed touching and rubbing the upper leg of a female student; (3) his pattern of inappropriate touching behavior is long-standing and on-going; (4) male and female students are "creeped out" by his inappropriate touching behavior; (5) female students try not to be alone with him; and (6) due to his position of authority, students are intimidated by his inappropriate behavior and fear retaliation by him. [Filing No. 68-14 at 4.] Shortly thereafter, Dr. Moeller provided a lengthy response to the Notice entitled "Explanation (Not Excuse)…." [Filing No. 68-18 at 3-4.] He admitted that "[t]he physical gestures noted in the complaint occurred, but not in the context suggested," that "[t]he frequency of the touching and its effect seem exaggerated," and that "I understand that students might reasonably choose to not give me recognizable negative feedback." [Filing No. 68-18 at 3.] Dr. Moeller also referred to a "needed change in my behavior," acknowledged "a serious mistake that must never happen again," stated that since receiving the Notice he has "put myself on 'zero tolerance,'" specifically discussed the incident where he touched a female student's leg, asked "for forgiveness of behavior that however well-intentioned, was received or observed with offense," and stated that he was "re-programming my errant reflexes." [Filing No. 68-18 at 3-4.] Dr. Moeller did not request further details regarding the allegations against him. [Filing No. 68-18 at 3-4.] Dr. Moeller's response – in which he admits to the behavior outlined in the Notice (though not the seriousness of that behavior) – indicates that he received notice of the allegations and understood them. *See, e.g.*, *Fong v. Purdue University*, 692 F.Supp. 930, 950 (N.D. Ind. 1988) ("the record is clear that the person in question understood the charges against him because he filed an answer to them…."). The Court finds that no reasonable jury could find that Dr. Moeller was not "afforded notice and a detailed explanation of the charges and the evidence against him …." *Grant*, 870 F.3d at 572. Any procedural due process

claim based on a failure to provide Dr. Moeller with notice of the allegations against him fails as

a matter of law.

After receiving notice, Dr. Moeller had several more opportunities to be heard by Ms.

Arvin and, later, during the OEO's investigation. Before his termination, the following occurred:

- Ms. Arvin interviewed Dr. Moeller on December 3, 2014, where he again admitted to touching the student on the thigh, and to rubbing and massaging the backs of female students without their permission. [Filing No. 68-1 at 12; Filing No. 68-2 at 3; Filing No. 68-9 at 18.]

- After Ms. Arvin completed her Report, which included findings from her interviews with students and Dr. Moeller, Dr. Moeller met with Dean Williams and Dr. Willis, his supervisor. Dean Williams advised Dr. Moeller that he would be temporarily relieved from his role. [Filing No. 68-2 at 8-9; Filing No. 68-23.]

- Dr. Moeller then emailed Dean Williams and Dr. Willis, attaching his response to the Notice. [Filing No. 68-24 at 1.]

- Dean Williams met with Dr. Moeller again on January 22, 2015, and Dr. Moeller's counsel sent a letter to Dean Williams on January 26, 2015 asserting that Dr. Moeller's conduct did not constitute sexual harassment and that the investigation was "flawed." [Filing No. 68-22 at 3; Filing No. 68-25.]

- On March 15, 2017, Dr. Moeller emailed Ms. Arvin requesting to review all records "that relate to the administrative processing of periodic incidents involving faculty, staff, student, or patient concerns. I am interested in the time period of 1985 to date." [Filing No. 79-51 at 1.] Ms. Arvin responded that Dr. Moeller had a chance to verbally respond, to be represented by counsel, to provide a written response, and to submit additional maters, and that there were no other incidents they considered during the investigation that he did not have an opportunity to address. [Filing No. 79-51 at 2.]

- Dr. Moeller emailed Dean Williams on March 24, 2015, again discussing "flaws" in the investigation. [Filing No. 68-26 at 2.]

- Dean Williams informed Dr. Moeller on March 26, 2015 that he was being terminated for cause. [Filing No. 68-27.]

Dr. Moeller addressed the allegations against him and/or raised concerns with Ms. Arvin

or Dean Williams at least seven times before the decision to terminate him was made. He argues

that Dr. Kirkland essentially had too much power in the decision-making process, and that there was no opportunity for Dr. Kirkland's decision to be reviewed. But the uncontroverted evidence establishes that Ms. Arvin communicated with Dr. Moeller several times, that Ms. Arvin drafted the Report, and that Dean Williams made the final termination decision.[8]

After his termination:

- Dr. Moeller (who by this time was acting through counsel) requested reconsideration of the termination decision due to irregularities in the investigation and because he felt the facts did not support a finding of sexual harassment. [Filing No. 68-28.]

- On April 3, 2015, Dr. Moeller submitted a complaint regarding the investigation to the Faculty Council. [Filing No. 68-31.]

- On April 3, 2015, Dr. Moeller filed a grievance with the FBR. [Filing No. 68-34.]

- Dean Williams advised Dr. Moeller on April 14, 2015 that the original decision was being upheld, and Dr. Moeller appealed the denial of his request for reconsideration on May 19, 2015. [Filing No. 68-2 at 16; Filing No. 68-29.] The University stopped paying Dr. Moeller on May 19, 2015. [Filing No. 68-30 at 2.]

- Also on May 19, 2015, the Faculty Council held a hearing at which Dr. Moeller and his counsel were present. [Filing No. 68-33.]

- On June 1, 2015, the Faculty Council found there were no irregularities in the OEO's principles, procedures, and investigation, but recommended some changes to the OEO's investigative policies and procedures. [Filing No. 68-33.]

---

[8] Dr. Moeller argues that Dean Williams only had the discretion to determine the sanctions and not the finding of policy violation, pointing to the specific evidence Dean Williams considered. [Filing No. 89 at 18-19.] For example, Dr. Moeller argues that Dean Williams "was unaware of many of the facts that Moeller relied upon to provide a proper context of the allegations," including, for example, "the students' obsession with Moeller's sex life and the untrue rumors circulating about him…." [Filing No. 89 at 18-19.] Dr. Moeller was terminated for touching a female student's thigh and for massaging and giving back rubs to female students, all of which he admitted doing. This extraneous information does not relate to the incidents that Dr. Moeller admitted occurred, and which formed the basis for his termination.

- On November 3, 2015, the FBR submitted its report in which it noted that it had held a hearing on October 29, 2015 (attended by Dr. Moeller and his counsel), and found that there were some "procedural deficiencies in four aspects of the process." [Filing No. 68-35.] The FBR set forth several recommendations. [Filing No. 68-35 at 5-6.]

- On December 1, 2015, Chancellor Paydar sent Dr. Moeller a letter offering to implement all of the FBR's recommendations on the condition that Dr. Moeller waive his right to appeal the decision, either internally or externally. [Filing No. 68-36 at 1-2.] Dr. Moeller declined Chancellor Paydar's offer. [Filing No. 68-2 at 18-19.]

- Dr. Moeller appealed Chancellor Paydar's decision to President McRobbie on December 7, 2015. [Filing No. 68-38.]

Post-termination, Dr. Moeller requested review of the termination decision or the procedure that led to that decision five times, and attended two hearings. Dr. Moeller has not presented any evidence that University officials did not take his requests for reconsideration, appeals, or complaints seriously, or did not consider the information he presented. *See Grant*, 870 F.3d at 572 ("[plaintiff] was also provided with ample and meaningful opportunity to be heard and to refute the charges against him, as demonstrated by the numerous written responses he submitted...and meetings with University officials. There is no evidence that these opportunities to be heard were not meaningful"). The second factor – the risk of erroneous deprivation of Dr. Moeller's interest through the procedures used and the probable value of additional safeguards – weighs heavily in favor of Defendants, as the Court finds that no reasonable jury could conclude that Dr. Moeller was not afforded due process either pre-termination or post-termination.

Finally, the third factor – the University's interest – weighs in favor of Defendants. Additional procedures were not necessary here to meet the procedural due process standard under federal law. *See Grant*, 870 F.3d at 572 ("The final factor also weighs in favor of the defendants.... [A]s our analysis of the second factor showed, additional procedures could not plausibly have prevented an erroneous deprivation"). The Court notes that the University has discretion to

determine the value it places on its students' safety and security, and to implement policies and procedures that reflect that determination. The University's decision to ensure an environment where students are free from uninvited back rubs, thigh touches and other physical contact by a clinical instructor who holds the power to negatively impact their clinical success is a lawful one within its prerogative. A procedural due process claim is not an invitation for the Court to consider whether it agrees with the University's value judgment, or whether it endorses the University's policies and procedures. Additionally, Dr. Moeller's "dissatisfaction with the process does not mean that the proceedings were not meaningful or did not give [him] an opportunity to be heard." *Brunswick Corporation v. McNabola*, 2017 WL 3008279, *6 (N.D. Ill. 2017). The process is not inadequate "because it did not produce the anticipated result," and the due process clause requires only that Dr. Moeller receive "adequate process, not the most advantageous process available to him." *Bettendorf v. St. Croix Cty.*, 631 F.3d 421, 427-28 (7th Cir. 2011). The Court's inquiry is whether Dr. Moeller had notice of the basis for the deprivation and a meaningful opportunity to be heard. Here, he did.

Defendants' Motion for Summary Judgment is **GRANTED** as it applies to Dr. Moeller's § 1983 procedural due process claim.

### 3. State Law Claims

Having granted summary judgment in favor of Defendants on Dr. Moeller's procedural due process claim – the only federal claim in this litigation – the Court must first determine whether it will exercise jurisdiction over Dr. Moeller's state law claims. The district court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district

court has dismissed all claims over which it has original jurisdiction….") (citation and quotation omitted). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 183 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

The Court finds that the balance of factors weighs in favor of exercising supplemental jurisdiction over the state law claims. This litigation is in a late stage. Discovery has been completed, the parties have briefed Defendants' Motion for Summary Judgment as it relates to the state law claims, and trial has been scheduled for the end of January 2018 for quite some time. Further, the remaining factors of judicial economy, convenience, fairness, and comity all lead the Court to conclude that exercising supplemental jurisdiction is proper. It would be a waste of judicial resources, inconvenient, and unfair for the parties to litigate the state law claims anew in state court after having litigated those claims in this Court for almost two years. The Court will exercise supplemental jurisdiction over Dr. Moeller's state law claims.

        a.  <u>Breach of Contract</u>

The Court has already granted summary judgment in favor of the University on Dr. Moeller's breach of contract claim based on Eleventh Amendment immunity. To the extent Dr. Moeller claims that the Individual Defendants breached a contract with him, the Court finds that such a claim would fail as a matter of law. The breach of contract claim is based on the letter from the University appointing Dr. Moeller to a term through the 2021-2022 school year. [*See* Filing No. 1 at 10-11.] The Individual Defendants cannot be liable for breach of contract related to signing the letter on behalf of the University. *See* Ind. Code § 34-13-2-1 ("A present or former public employee…is not personally liable on contracts entered into within the scope of the

employee's employment for a governmental entity unless it is clearly otherwise indicated in writing"). In addition, Dr. Moeller did not respond to Defendants' substantive arguments relating to the breach of contract claim so has waived any arguments in opposition. Dr. Moeller has not presented any evidence that any of the Individual Defendants entered into a contract with him, and they are entitled to summary judgment on his breach of contract claim.

       b.  <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

Having granted summary judgment in favor of the University on Dr. Moeller's breach of the covenant of good faith and fair dealing claim based on Eleventh Amendment immunity, the only remaining claim is Dr. Moeller's claim for breach of the covenant of good faith and fair dealing against Dean Williams. In connection with that claim, Dr. Moeller asserts that his "pay during the period of his suspension ended on April 9, 2015," and that Dean Williams decided to stop his pay "in violation of [the University's] own policies and procedures" which is "a breach of the covenant of good faith." [Filing No. 1 at 13-15.] Defendants argue that Dr. Moeller did not have an employment contract that provided him with the right to receive pay during his suspension but that, in any event, it is undisputed that the University paid Dr. Moeller until his termination on May 19, 2015. [Filing No. 90 at 35-36.]

Dr. Moeller did not respond to Defendants' arguments, instead stating that he "has filed his Motion to Dismiss his claims of breach of contract and breach of duty of good faith and fair dealing, rendering moot IU's argument [on] these issues." [Filing No. 89 at 38.]

In their reply, Defendants note that Dr. Moeller did not substantively respond to their arguments, and argue that Dr. Moeller cannot dismiss his claim as a matter of right at this stage of the litigation because Defendants have been forced to defend against it. [Filing No. 91 at 16-17.] Defendants also contend that Dr. Moeller does not dispute that he touched a student "on the left

thigh just above her knee," that he has massaged and rubbed the backs of students for years, that students told the OEO that his touching made them feel uncomfortable, that he admitted to committing a "serious mistake that must never happen again," and that his employment was terminated for serious personal misconduct.  [Filing No. 91 at 17-18.]

The Court finds that Dr. Moeller's breach of the covenant of good faith and fair dealing claim against Dean Williams fails as a matter of law.   First, Dr. Moeller did not respond substantively to Defendants' arguments, which constitutes waiver of any argument in opposition to summary judgment on this claim.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument – as [Plaintiff has] done here – results in waiver"); *see also Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013)).

Second, Dr. Moeller bases his claim in part on the "decision to non-renew Dr. Moeller's seven…year appointment."  [Filing No. 1 at 14.]  Dr. Moeller's breach of the covenant of good faith and fair dealing claim must be premised on a contract.  *See Binns v. Ocwen Loan Servicing, LLC*, 2015 WL 5785693, *10 (S.D. Ind. 2015) ("the Duty of Good Faith and Fair Dealing is 'an implied covenant that only arises in insurance and employment contracts or where contracts are ambiguous as to the application of the covenants or expressly impose them'") (quoting *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. App. 2011)).   Dr. Moeller relies upon the University's Handbook as the basis for this claim.  [Filing No. 1 at 13-14 (quoting the University's procedures for "Permanent Separation for Academic Appointees" and the "Protection of Academic Freedom").]  But the University's Handbook explicitly states that "Statements and policies in this Handbook do not create a contract and do not create any legal rights…."  [Filing No. 68-6 (emphasis omitted).]  *See also Packer v. Trs. of Indiana University School Of Medicine*, 73 F. Supp. 3d 1030, 1040 (S.D. Ind. 2014) ("The tenure policies that Dr. Packer relies upon to show

that she has a contract with IUSM are contained in IU's Academic Handbook, which states in its preamble that it does not create a contract and does not create any legal rights.… Because the Academic Handbook explicitly disclaims any creation of a contract, Dr. Packer cannot rely upon these policies as a basis for her breach of contract claim").[9]

Finally, Dr. Moeller alleges as part of his breach of the covenant of good faith and fair dealing claim that he was not paid for his entire suspension period, but only until April 9, 2015. [Filing No. 1 at 14.] However, the University contends that it paid Dr. Moeller until his termination on May 19, 2015, and supports that contention with citation to its answer to one of Dr. Moeller's interrogatories. [Filing No. 68-30 at 2.] Dr. Moeller does not contest this fact. [*See* Filing No. 89.]

Dr. Moeller's breach of the covenant of good faith and fair dealing claim against Dean Williams fails as a matter of law because Dr. Moeller did not address Defendants' arguments in support of summary judgment, because it is not based on a valid contract, and because the undisputed evidence shows that the University did, in fact, pay Dr. Moeller up to the date of his termination. Defendants' Motion for Summary Judgment as to Dr. Moeller's breach of the covenant of good faith and fair dealing claim is **GRANTED**.

To the extent set forth above, the Court **GRANTS** Defendants' Motion for Summary

---

[9] Dr. Moeller mentions his appointment to a seven-year term in connection with his breach of the covenant of good faith and fair dealing claim, but his claim against Dean Williams appears to be based on the University's procedures and not on a theory that the letter appointing him to a seven-year term was a contract (although his breach of contract claim is based on the reappointment letter). [*See* Filing No. 1 at 14 (Dr. Moeller alleging that "Williams' decision to non-renew Dr. Moeller's seven (7) year appointment was without faculty consultation and in violation of the University's Non-reappointment Procedures" and "Williams'…decision to stop payments to Dr. Moeller in violation of its own policies and procedures is a breach of the covenant of good faith").]

Judgment, [Filing No. 68], on all of Dr. Moeller's claims.[10]

IV.

## CONCLUSION

In sum, the Court finds that it is improper to dismiss Dr. Moeller's breach of contract and breach of the covenant of good faith and fair dealing claims without prejudice because Defendants would suffer plain legal prejudice and because Eleventh Amendment immunity does not divest the Court of subject matter jurisdiction over those claims. Accordingly, the Court **GRANTS** Defendants' Motion for Leave to File Surreply in Opposition to Plaintiff's Motion to Dismiss Counts Two and Five, [84], and **DENIES** Dr. Moeller's Motion to Dismiss Counts Two and Five Without Prejudice, [80].

Further the Court finds that the University is entitled to Eleventh Amendment immunity on all of Dr. Moeller's claims, that Dr. Moeller's procedural due process claim against the Individual Defendants fails because no reasonable jury could find that Dr. Moeller did not receive notice and a meaningful opportunity – indeed, many meaningful opportunities – to be heard, and that Dr. Moeller's breach of contract claim against the Individual Defendants and his breach of the

---

[10] The Court need not, and will not, consider Defendants' additional arguments that the Individual Defendants are entitled to qualified immunity, that Dr. Moeller is not entitled to front pay, or that Dr. Moeller failed to mitigate his damages. The Court is compelled, however, to briefly address one of Dr. Moeller's arguments in connection with qualified immunity. At bottom, Dr. Moeller argues that his conduct did not rise to the level of sexual harassment and that he did not create a hostile work environment, as defined in federal court opinions. Dr. Moeller provides no authority for the proposition that the University could only fire him for sexual harassment or creating a hostile work environment as defined by federal case law. Dr. Moeller was terminated for "serious personal or professional misconduct," which included violating the University's policy against sexual harassment. Dr. Moeller is not the arbiter of the parameters of "serious misconduct", or of how the recipients of his actions should have felt or reacted. The Court rejects the overall theme of his argument – that the Defendants were somehow required to conclude that although he engaged in the conduct for which he was terminated, he should be excused either because he did not intend the consequences or because the recipients of his behavior should not have been offended.

covenant of good faith and fair dealing claim against Dean Williams fail as a matter of law. The Court **GRANTS** Defendants' Motion for Summary Judgment, [68], on all of Dr. Moeller's claims. Final judgment shall enter accordingly.

Date: 12/27/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**